UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

FELICE MILLER,                          :
                                        :
                Plaintiff,              :          **MEMORANDUM AND ORDER**
                                        :          02-CV-5612 (DLI)(ARL)
        -against-                       :
                                        :
BATESVILLE CASKET CO.,                  :
                                        :
                Defendant,              :

-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff, Felice Miller ("Miller"), brings this action against defendant, Batesville Casket Company ("Batesville" or "Defendant") alleging gender discrimination and retaliation for engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), New York State Human Rights Law ("N.Y.S.H.R.L.") and the Equal Pay Act. Defendant now moves for summary judgment under Fed. R. Civ. P. 56. Defendant also moves to strike Miller's Local Rule 56 Counter-Statement of Facts ("Pl. Counter-Stat.") and Miller's Affidavit in Opposition to Defendant's Motion ("Miller Aff."). For the reasons set forth below, Defendant's motion to strike is denied, but summary judgment is granted in Defendant's favor.

**STATEMENT OF FACTS**

Batesville is a manufacture and seller of burial and cremation products. Defendant's Local Rule 56 Statement ("Def's Rule 56 Stat.") ¶ 1. Batesville sells its products through regional sales representatives. *Id.* Miller was hired as a sales representative in January 2000 for Batesville's Mid-Atlantic Region, which encompasses, in part, Queens, Nassau and Suffolk counties. *Id.* ¶¶ 2-3. Batesville employed multiple sales representatives in the Mid-Atlantic region. *Id.* Each customer

1

was assigned a single sales representative, thus giving Miller the exclusive right to service customer accounts. *Id.* at ¶ 5. When Miller started with Batesville she received a salary and was reimbursed for her expenses, but she did not receive commissions. *Id.* at ¶ 6-7; Plaintiff's Local Rule 56 Counter-Statement ("Pl's Rule 56 Counter-Stat.") ¶ 7.

Batesville's Reorganization, Transfer of Accounts and Changes in Compensation

In December 2001 Batesville combined its Metro Region with its Mid-Atlantic Region. Def's Rule 56 Stat. ¶ 9. The former head of the Metro Region, Paul Theesfeld, was demoted and became a sales representative in the Mid-Atlantic Region. *Id.* Similarly, Paul Ferris, a former Regional Sales Director and owner of a competing casket company, was made a sales representative in the Mid-Atlantic Region. *Id.* In March 2002, Batesville reorganized the sales force in the new, larger, Mid-Atlantic Region and terminated several sales representatives. *Id.* at ¶ 10; Pl's Rule 56.1 Counter-Stat. ¶ 10. Miller kept her job. Def's Rule 56 Stat. ¶ 11. In conjunction with the reorganization, Batesville changed the method of compensating sales representatives. *Id.* at ¶ 12. Under the new system, sales representatives no longer earned a salary and reimbursement for expenses. *Id.* Rather, Batesville introduced a system where sales representatives were given a reduced base salary but received commissions. *Id.* at ¶ 12-13. Sales representatives were no longer reimbursed for their expenses, although Miller alleges that some sales representatives were reimbursed for their cell phone charges. *Id.*; Pl's Rule 56 Counter-Stat. ¶ 15.

Batesville developed a formula to estimate how much each sales representative would earn under the new commission-based system. *Id.* at ¶19-20. First, Batesville configured a target list of accounts which the sales representative could visit in a year. *Id.* Next, Batesville estimated the commissions that could be earned from each account, based on prior years' sales. *Id.* at 20. Under

this system, a large account required more visits than a small one but could also be counted on to produce greater commissions. *Id.* at ¶ 40. As part of the new system, Batesville offered a "growth bonus" for growing accounts, meaning that a sales representative could be rewarded for servicing an underperforming account. Def's Rule 56 Stat. ¶¶ 27-30. If the projected commissions were less than the sales representative's previous annual salary, the sales representative was given a "salary supplement." *Id.*

In 2001, under the old compensation structure, Miller earned a salary of approximately $71,000, and was reimbursed for $22,000 in expenses. Miller's total compensation in 2001 was around $93,000. *Id* at ¶¶ 7, 18; Pl's Rule 56 Counter-Stat. ¶¶ 7; 18. In 2002, under the new compensation structure, Miller earned $46,000 in commissions and was given a salary supplement of $64,417, for a total salary of $110,417. Def's Rule 56 Stat. ¶ 18. However, in 2002 Miller had $22,000 in work related expenses which were not reimbursed. Thus, Miller's net salary for 2002 was $88,417. Pl's Rule 56 Counter-Stat. ¶ 18. Miller's compensation under the new system thus was less than her salary under the old system.

Theesfeld had been a manager in previous years and not a sales representative. For Theesfeld, the formula was used to create account lists (with expected commissions plus a salary supplement) that would approximate his prior year's management salary. *Id.* at 21, 44. Thus, in 2002, under the new structure, Theesfeld had commissions of approximately $63,413, was given an $88,725 salary supplement and a bonus of $14,098, among other compensations. Miller Affidavit in Opposition to Defendant's Motion ("Miller Aff") Exhibit G. Similarly, in 2002, under the new salary structure, Ferris earned $40,342 in commissions and was given an $87,198.55 salary supplement, among other compensations. *Id.* at ¶¶ 34-38.

With respect to the way accounts were redistributed, Batesville admits that Miller both gained and lost accounts, but the parties appear to disagree about the quality of the accounts which Miller gained and lost. Def's Rule 56 Stat. ¶¶ 34-40; Pl's Rule 56 Counter-Stat. ¶¶ 93-96. Miller strenuously asserts that she was given substandard accounts in the reorganization while the better accounts were reserved for the male sales representatives. Pl's Rule 56 Counter-Stat. ¶¶ 31, 35, 37, 41, 44, 48, 49, 50. The redistribution of accounts was significant because, although the commissions were uniform for any product, Miller alleges that some accounts could be expected to produce more sales, and, therefore, were more valuable than other accounts. Pl's Rule 56 Counter-Stat. ¶ 25. Miller alleges that Theesfeld's and Ferris' commissions were earned on these "prime" accounts. Miller Aff. ¶ 22. Miller also alleges that Theesfeld and Ferris were given costumers in a large, multi-state area, while her accounts were confined to Long Island and Queens. Pl's Rule 56 Counter-Stat. ¶ 31. Batesville asserts that accounts were distributed based on a variety of factors, including geography, the need to maintain compensation levels and the need to adhere to customers' demands. For added effect, Batesville asserts that some of Miller's accounts were transferred away from her at the customer's request. Def's Rule 56 Stat. ¶¶ 97-107. Miller, for her part, denies that the customers were unhappy with her services. Pl's Rule 56 Counter-Stat. ¶¶ 97-107.

The August 2002 training

In August 2002, Miller attended a training at Batesville's headquarters. Def's Rule 56 Stat. ¶ 60. Part of the training involved a simulator that tested a sales representative's acumen. *Id.* at ¶ 59. Miller failed the simulator test. *Id.* at ¶ 63. Another part of the training required the sales representatives to analyze case studies. *Id.* at ¶ 64. The case studies were graded by Jan Bell, an instructor for Batesville. *Id.* at ¶ 67. Miller did not do well on the case studies, and Bell reviewed

Miller's answers with her. *Id.* at ¶¶ 67-69. Bell also commented on the fact that Miller had been seen talking to Tim Cutter, another sales representative, and that Bell believed that other sales representatives thought that Miller and Cutter were flirting. *Id.* at ¶ 68. Bell's suggestion apparently caused Miller "extreme humiliation" causing her to seek medical attention. Miller Aff. ¶ 15.

Miller believes that Bell did not grade the test fairly. Pl's Rule 56 Counter-Stat. ¶ 80. Although Miller and Batesville initially had some difficulty finding a mutually convenient time to administer a re-test, eventually Miller retook the exam and passed. Def's Rule 56 Stat. ¶¶ 76-80. Miller complained to Batesville's president, Ken Camp, about the alleged harassment. Miller Aff. ¶ 15. Camp allegedly responded with a thinly veiled reference to Miller's "biological clock," which Miller believed also constituted harassment. *Id.*

Because of the alleged discriminatory effect of the restructuring, and the alleged harassment at the training, Miller filed her first employment discrimination complaint, in New York State Supreme Court, Nassau County in October 2002. Batesville promptly removed the action to this Court. *See* ECF Docket Entries No. 1. The complaint has been amended twice to allege retaliation and further acts of gender discrimination. For purposes of this motion, the operative pleading in Miller's Second Amended and Supplemental Complaint, ("Complaint") filed on September 15, 2005.[1]

---

[1] In the Complaint, Miller alleges that she filed a charge of discrimination with the U.S. Equal Opportunity Employment Commission on March 16, 2004 and "expects to obtain a notice of right to sue forthwith." Complaint, ¶ 4. In its Answer and Defenses to the Second Amended and Supplemental Complaint ("Answer"), Batesville denies that Miller "has satisfied the statutory prerequisite to suit under Title VII." Answer, ¶ 4. The Answer also contains an affirmative defense alleging that Miller failed to meet the statutory prerequisite to suit. Answer, Seventh Affirmative Defense. Much of the alleged discriminatory conduct occurred more than 300 days before March 16, 2004 and the court has serious reservations regarding whether the EEOC charge was timely filed. The court is also concerned that neither Miller nor Batesville

Golf Outings, Tuition Reimbursement and Other Perks

Miller alleges that Batesville discriminated against her by restricting her access to certain job related perks. First, Miller did not attend several company golf outings. *Id.* at ¶¶ 81-89. Although Miller concedes that she did not golf, she alleges that she was not invited to the outings, even though her clients were. Pl's Rule 56 Counter-Stat. ¶¶ 81-82. Batesville claims that Miller was invited to the outings but chose not to attend. Def's Rule 56 Stat. ¶¶ 82-86. Second, Batesville made a company plane available for sales representatives to fly customers to Batesville's headquarters. *Id.* at ¶ 90. Miller was never scheduled to use the plane. *Id.* Third, Batesville had a tuition reimbursement program that allowed sales representatives to earn a master's degree in business administration at the company's expense. *Id.* at 108-109. Miller took advantage of the program. *Id.* at 109. In March 2003, Batesville changed the program and required employees to reapply for tuition reimbursement. Under the new program, if an employee did not work at Batesville for a sufficient amount of time after receiving the reimbursement, Batesville could require the employee to pay back all the tuition it had paid. *Id*; Def's Rule 56 Stat. ¶114. By March 2003, Miller had commenced litigation against Batesville and felt that her time with Batesville was limited. Pl's Rule 56 Counter-Stat. ¶ 112. Thus, the change in policy forced Miller to pay her tuition without reimbursement from Batesville. Miller alleges that this policy change was implemented to retaliate against her for filing suit. Pl's Rule 56 Counter-Stat. ¶ 110. Miller also alleges that Batesville contractually obligated itself to reimburse her. *Id.*

makes any reference to Miller having received a right to sue letter from the EEOC. However, because neither party briefed this issue, and "in the employment discrimination context that 'the exhaustion requirement, while weighty, is not jurisdictional'" the court will not address Miller's compliance with the statutory prerequisites to suit. *Fernandez v. Chertoff*, 471 F.3d 45, 58 (2d Cir. 2006) (quoting *Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir.2000)).

<u>Miller's Performance Improvement Plan and Separation from Batesville</u>

In 2004, approximately two years after folding its Metro Region into the Mid-Atlantic Region, Batesville reversed itself and reestablished the Metro Region under the leadership of Nectar Ramirez-Gosdin. Def's Rule 56 Stat. ¶116. Miller's territory was in the Metro Region. *Id.* at ¶ 117. Miller was not meeting her sales goals and Ramirez-Gosdin met with her to discuss the problem. *Id.* at ¶¶ 118-119. Miller denies that she was ever told she was underperforming. Pl's Rule 56 Counter-Stat. ¶ 118.

In May 2004, Miller was formally evaluated. Def's Rule 56 Stat. ¶120. The evaluation was not favorable. Miller alleges that the evaluation process was skewed against her in retaliation for the complaint she filed in October 2002. Miller Aff. ¶¶ 20, 21, 26-28. Miller points to the delay in her evaluation and the fact that Theesfeld was never evaluated as evidence that the evaluation process was skewed against her. Pl's Rule 56 Counter-Stat. ¶ 120. Batesville maintains that Miller was not evaluated any differently than other sales representatives. Def's Rule 56 Stat. ¶120. Miller was warned that she would be placed on a "Performance Improvement Plan" ("PIP") if she did not improve. *Id.* at 126.

On August 24, 2004, Ramirez-Gosdin met with Miller to present the PIP. Def's Rule 56 Stat. ¶ 132. Miller had already made some improvement since her May of 2004 evaluation, and therefore Ramirez-Gosdin decided to extend the time frame of the PIP from 60-days to 90-days. *Id.* at ¶ 134. Under the PIP, Miller was required to sell 75 units of new products and one e-business installation. *Id.* at ¶ 136. Miller objected and, after consultations, Miller was only required to sell 50 units of new products. *Id.* at 137. In addition, Miller was required to reach 95% of her burial quota for two months. *Id.*

Miller claims the PIP precipitated her resignation because the goals in the PIP were not obtainable. Pl's Rule 56 Counter-Stat. ¶¶ 136-138. For example, Miller alleges that she would have been required to sell $200,000 worth of products in 60 days in order to obtain 95% of her burial quota for the period, which fell during a slow season. *Id.* at 27. Moreover, Miller alleges that the PIP was only necessary because Batesville had been underreporting her sales – had the reports been accurate, Miller alleges that her performance would have been satisfactory. Miller Aff. ¶¶ 26-28. Miller also alleges that the PIP given to Ed Forte and Frank Connelly, two other sales representatives, had more obtainable goals than the PIP given to her. *Id. at* 27. Instead of attempting to meet the PIP's goals, Miller resigned. Def's Rule 56 Stat. ¶144. Batesville encouraged Miller to stay on but she declined to do so. *Id.* at 145.

## DISCUSSION

<u>Summary Judgment Standard</u>

Summary judgment is appropriate "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 158–59 (1970)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48.

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1998); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 989, 998 (2d Cir. 1989). However, the Second Circuit has maintained that summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Airlines Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). In order to defeat summary judgment, the non-movant carries only "a limited burden of production," but "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (internal quotations omitted). The function of the court on a motion for summary judgment in an employment discrimination case "is to determine whether the proffered admissible evidence 'shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 204 (2d Cir. 1995) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)). The inference of a discriminatory motive must be supported by something more than mere conjecture since 'conclusory statements, conjecture, or speculation' are inadequate to defeat a motion for summary judgment." *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 370 n. 3 (2d Cir.2003) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996).

<u>Defendant's Motion to Strike</u>

Defendant has made a motion to strike Plaintiff's Local Rule 56.1 Counter-Statement of Material Facts as well as her Affidavit in Opposition to Defendant's Motion. Defendant correctly asserts that all the statements in Defendants Rule 56.1 Statement that Plaintiff agrees with and all

those statements for which Plaintiff does not have knowledge to contest are deemed admitted and cannot be used to create issues of material fact. *See Alliance Security Products, Inc. v. Fleming Co.,* 471 F.Supp.2d 452 (S.D.N.Y. 2007). However, Defendant incorrectly contends that Plaintiff's Local Rule 56.1 Counter-Statement of Material Facts is insufficient because it cites to Plaintiff's Affidavit in Opposition to Defendant's Motion. Plaintiff is only required to cite to admissible evidence and, except to the extent explained below, plaintiff's affidavit is admissible. *See Elliott v. British Tourist Authority,* 172 F. Supp. 2d 395, 403 (S.D.N.Y. 2003). Therefore, the court will not strike any portion of Plaintiff's Local Rule 56.1 Counter-Statement of Material Facts.

Defendant next asks the court to strike Plaintiff's Affidavit in Opposition to Defendant's Motion on the grounds that it contradicts her deposition testimony, contains hearsay evidence, is conclusory and is not based on personal knowledge. The court declines Defendant's invitation to analyze Plaintiff's affidavit line-by-line to determine which parts comport with the local rules and Fed. R. Civ. P. 56(e) and which do not. The better course of action is to admit Plaintiff's affidavit, but to give little weight to those allegations which are not properly supported. *See Flaherty v. Filardi,* 3 CV 2167, 2007 WL 163112, *4 (S.D.N.Y. Jan 24, 2007)("[t]his court will disregard those portions of Plaintiff's submission which are inappropriate, but will not expend limited judicial resources scrutinizing each line."); *but see Ofoedu v. St. Francis Hosp. and Medical Center*, 04 CV 1707, 2006 WL 2642415, *1 (D. Conn. Sep 13, 2006) (scrutinizing an affidavit in opposition to summary judgment line by line); *Perkins v. Memorial Sloane-Kettering Cancer Center*, 02 CV. 6493, 2005 WL 2453078, *14 (S.D.N.Y. Sep 30, 2005) (same).

Even if the court conducted a line-by-line analysis of Miller's affidavit, most of the material contentions are not conclusory and are based on her personal knowledge. The court would not strike

this evidence.  *See Zubrow v. Solvay Pharmaceuticals,* 03 CV 1929, 2006 WL 288381, *5-6 (D.Conn. Feb. 7, 2006).  Miller has personal knowledge that: Theesfeld and Ferris were assigned accounts in the Mid-Atlantic and Metro Regions; she was not invited to certain golf outings; Batesville altered the tuition reimbursement program in a way that negatively impacted her; she was required to take the Navigator test again; Jan Bell accused her of the flirting during a training session; and she was placed on a PIP with goals she believed were not obtainable.  Indeed, some of Miller's assertions are poorly documented in the record, but this is not a reason to strike her affidavit. *Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 503-504 (S.D.N.Y. 2005) (denying a motion to strike an affidavit for violating Fed. R. Civ. P. 56(e) because "the lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the testimony, which have to be determined by the trier of fact at trial"). Therefore, Defendant's motion to strike is denied.  In any event, nothing in the rules or the case law requires a court to strike any portion of an affidavit that is not properly supported.  *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999) (*abrog't on other grnds. by Schnabel v. Abramson,* 232 F.3d 83 (2d Cir. 2000) ("a court *may* ... strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.")(emphasis added).

Gender Discrimination

Under the burden-shifting rules set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff in a gender discrimination action has the initial burden of making out a prima facie

case of discrimination.[2] *See id*. at 802; *Vogel v. State University of New York at Stony Brook*, 00 CV 1129, 2005 WL 2219298 (E.D.N.Y., Sept. 9, 2005) (applying the *McDonnell Douglas* framework to a gender discrimination action).   A prima facia case  may be established by showing (1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action.  The fourth and most important prong is that "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in [a protected] class." *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001).

Defendant first argues that Plaintiff did not experience any adverse employment actions.  An adverse employment action includes "a change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Education*, 202 F.3d 636, 640 (2d Cir. 2000) (ellipsis-in-original) (quotations and citation omitted). Examples of adverse actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id*. (quotations and citations omitted); *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (giving examples of adverse actions such as termination, demotion via a reduced wage, salary, or job title, a material loss of benefits, or significantly reduced responsibilities)(citations omitted); *Fairbrother v. Morrison*, 412 F.2d 39, 56 (2d Cir. 2005).

---

[2]      Miller's claims under the NYSHRL are determined in the identical manner to Miller's federal claims.  *See Norville v. Staten Island University Hosp.,* 196 F.3d 89, 96 (2d Cir. 1999).  Thus, a dismissal of Miller's federal claims requires a dismissal of Miller's NYCHRL claims.

Miller presents a laundry list of allegedly adverse actions, which include not being invited to golf outings, having to retake a test that she failed (allegedly because the test was graded subjectively), and not being permitted to use the corporate jet. In order to determine whether an action which falls outside of the "classic" adverse employment actions qualifies to make out a prima-facia case, the court is required to look at "totality of the circumstances." *See Phillips v. Bowens*, 278 F.3d 103 (2d Cir. 2002). In *Phillips*, which involved a First Amendment retaliation claim and not an employment discrimination claim, the court held that a series of "lesser actions" may also meet the adversity threshold if a plaintiff can show: "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Id.* at 109. Under that test, the actions that plaintiff complains about do not qualify as adverse employment actions. *See also Augustus v. MSG Metro Channel*, 217 F. Supp. 2d 458, 460 (S.D.N.Y. 2002) (unequal use of car service and intern were not adverse actions).

Nor does Miller's constructive discharge qualify as an adverse employment action for purposes of her discrimination claim. A resignation is only an adverse employment action if, under an objective standard, the court finds that a reasonable person in the employee's position would have felt compelled to resign. *Perfetto v. Erie County Water Authority*, 03 CV 0439E(F), 2006 WL 1888556 (W.D.N.Y. Jul. 7, 2006) (finding that the plaintiff failed to allege facts raising a genuine issue as to whether his working conditions at the time of his resignation were so intolerable that a reasonable person would have felt compelled to resign); *see also Pennsylvania State Police v. Suders,* 542 U.S. 129, 146, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004)(in a sexual harassment case, a resignation is tantamount to termination if working conditions became objectively

intolerable).

In this case, Miller's accounts changed when Batesville restructured its sales force in March 2002. Miller alleges that 18 months later, in August 2004, she was forced to resign because Defendant was under reporting her sales and her PIP contained unrealistic goals. Miller Aff. ¶ 8. Defendant, however, asked Miller to remain with Batesville and at least try to meet the goals in the PIP. Batesville also promised to work with Miller to report her sales more accurately. Miller may have believed that she had no choice but to resign. However, when viewed objectively, the court finds that it was unreasonable for Miller to resign without at least attempting to meet the PIP's goals. *See Alfieri v. SYSCO Food Services-Syracuse,* 192 F. Supp. 2d 14, 23-25 (W.D.N.Y. 2001) (no adverse employment action where an employee resigned after being put on a performance improvement plan because she was not being threatened with immediate discharge, demotion, or a cut in pay, and her duties had not been changed); *c.f. Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir. 1987) (finding evidence of constructive discharge because a supervisor told employee "he would be fired at the end of [a] probationary period no matter what he did to improve his allegedly deficient performance."). If anything, Miller "preferred not to continue working for" Batesville, since she believed that she was treated unfairly. *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993). Resigning under such circumstances does not qualify as a constructive discharge for purposes of establishing an adverse employment action.

Miller also alleges that the evaluation process that lead to her PIP was, itself, an adverse employment action. However, being subject to an evaluation is an adverse employment action only when the evaluation has a negative impact on an employee's work environment. *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 248 (S.D.N.Y.2001). Miller's PIP was nothing more than an

attempt by Batesville to supervise her sales by prescribing quotas and goals. Increased supervision, without more, is not an adverse employment action. *See Valenti v. Massapequa Union Free School Dist.*, 03 CV 1193, 04 CV 5271, 2006 WL 2570871, *11 (E.D.N.Y. Sept. 5, 2006) (finding that for a claim of "increased supervision" to be actionable, it must be accompanied by "unfavorable consequences.")(*quoting Scafidi v. Baldwin Union Free School Dist.,* 295 F. Supp. 2d 235, 239-241 (E.D.N.Y. 2003)). Miller's poor evaluations (which she alleges were unfair) led Batesville to place her on a PIP. As noted above, the PIP did not force Miller to resign – she chose to do so herself. Therefore, Miller's claim that she was evaluated and that her sales were underreported does not constitute an adverse employment action.

Accepting all the evidence in the light most favorable to Miller, as the court is required to do, Miller has two potentially viable adverse employment actions on which she can base her claim of gender discrimination: (1) she was given less desirable accounts and paid less than certain male sales representatives; (2) she was subject to a changed tuition reimbursement policy.

*Tuition Reimbursement Policy*

Batesville's decision to alter its tuition reimbursement policy qualifies as an adverse employment action because tuition assistance was a part of Miller's compensation. *See Cunningham v. Consolidated Edison Inc.*, 03 CV 3522, 2006 WL 842914, (E.D.N.Y. Mar. 25, 2006); *Sundaram v. Brookhaven Nat. Laboratories*, 424 F. Supp. 2d 545 (E.D.N.Y. 2006)(denial of tuition reimbursement constituted an adverse employment action). However, Miller's claim that the change in policy was discriminatory fails because the policy was changed for *every* Batesville sales representative, not just Miller.

The forth prong of the *McDonnell Douglas* framework requires a plaintiff to show that the

adverse action took place under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas v. Green*, 411 U.S. at 802. The fourth factor is flexible, and "there is no unbending or rigid rule about what circumstances allow an inference of discrimination" *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). A variety of circumstances can give rise to such an inference, including "actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus . . . preferential treatment given to employees outside the protected class . . . [or] the timing or sequence of events leading to the plaintiff's termination." *Id.* (citations omitted). Here, Miller has failed to set forth *any* evidence, or even allege, that the tuition reimbursement program was changed to adversely affect women or her directly. Miller only alleges that she had a contract that entitled her to tuition reimbursement for 57 credits and Batesville breached the contract by changing its policy. Miller Aff. ¶ 17. At most, Miller may have a breach of contract action against Batesville. However, there is no evidence that the change in policy took place under circumstances giving rise to an inference of discrimination. Therefore, Miller has failed to set forth a prima facia case with respect to her claim that Batesville discriminated against her by changing its tuition reimbursement policy.

*Distribution of Accounts*

Miller alleges that male sales representatives were given choice accounts and larger salary supplements than she was. The first three prongs of Miller's prima facie case are satisfied because an unequal distribution of accounts is an adverse employment action where the distribution of accounts affects the sales representatives' ability to earn commissions. *See Legrand v. New York Restaurant School/Education Management Corp.*, 02 CV 2249, 2004 WL 1555102, *4. (S.D.N.Y., Jul. 12, 2004). Similarly, disparity in pay constitutes an adverse employment action. *Belfi v.*

*Prendergast*, 191 F.3d 129, 140 (2d Cir. 1999). With respect to the fourth prong, Miller's burden is minimal. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 447 (2d Cir. 1999);*Ferrand v. Credit Lyonnais*, 02 CV 5191, 2003 WL 22251313, (S.D.N.Y. Sept. 30, 2003). One method of proving discrimination is to show that employees not in the protected group (i.e. men) were treated more favorably than Miller. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) ("circumstances contributing to an inference of discriminatory intent may include ... the more favorable treatment of employees not in the protected group."); *Everson v. New York City Transit Authority*, 02 CV 1121, 2007 WL 539159, *11 (E.D.N.Y. Feb 16, 2007) (*prima facia* case established by showing that employee was replaced by someone outside the protected class). Miller has alleged a prima facia case of gender discrimination.

Once the plaintiff has established a *prima facie case,* the defendant is required to articulate a legitimate and nondiscriminatory explanation for its conduct. *Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir. 1997). This burden, like the plaintiff's burden of establishing a *prima facia* case, is slight and can be satisfied by defendant's production of evidence that its conduct was motivated by legitimate and nondiscriminatory reasons. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 505 (1993). The defendant does not have to persuade the court that its legitimate non-discriminatory reason is true; it is only required to articulate one. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2nd Cir. 1998) ("[t]he employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior."). Batesville has done exactly that.

The evidence indicates that, in December 2001, Batesville restructured its sales force, including combining the Metro Region with the Mid-Atlantic Region. As part of the restructuring,

Theesfeld was demoted from head of the Metro Region to a sales representative in the Mid-Atlantic Region. Ferris, a former Batesville regional sales manager was bought back to Batesville after starting a competing casket company. A few months later, and partially in response to the reorganization, Batesville revised the way its sales representatives were compensated. Under the new system, sales representatives were paid by commission, which required Batesville to distribute accounts in such a way that each sales representative could expect a similar income in commissions to what their salary had been under the old system. When expected commissions did not approximate a sales representative's old salary, sales representatives were given a "salary supplement" to bridge the gap.

The record indicates that Theesfeld had been with Batesville for thirty years and both he and Ferris had high income expectations. Batesville was willing to go out of its way to appease them, particularly because they had been demoted in the reorganization. In order to approximate Theesfeld's and Ferris prior salaries, Batesville gave them choice accounts (ones with high expected commissions) and a large salary supplement. According to Batesville, its preferential treatment of Theesfeld and Ferris affected both male and female sales representatives in the Mid-Atlantic Region. Although Batesville's approach was somewhat unfair to existing sales representatives, Batesville has met its burden of articulating a legitimate, non-discriminatory reason why Theesfeld and Ferris (both men) were paid more and given more lucrative accounts than Miller (a woman).

Under the *McDonnell Douglas* burden shifting framework, once a defendant meets its burden of articulating a legitimate, non-discriminatory reason for the adverse action, the presumption of discrimination created by the plaintiff's prima facie case is rebutted and "simply drops out of the picture." *St. Mary's Honor Center*, 509 U.S. at 502. At this point, in order to preserve its claim,

the plaintiff must show that the defendant's proffered reasons are pretextual and that discriminatory animus is the real motive. *Fisher*, 114 F.3d at 1337 n. 5. Although the plaintiff is entitled to rely on the same evidence upon which it established its prima facie case to show that defendant's proffered reason is false, the plaintiff has an added burden of convincing the court that defendant's legitimate, non-discriminatory reason is actually a pretext for discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)("[t]hus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *McCarthy v. New York City Technical College of City University of New York*, 202 F.3d 161, 166 (2nd Cir. 2000).

In order to demonstrate that Batesville's legitimate reasons are false, Miller relies on the same evidence she used to establish her prima facie case. However, Miller fails to show that Batesville is misleading the court as to the reason why certain male employees had better accounts and larger salary supplements than she did. Miller cannot show that Batesville's legitimate, non-discriminatory reason is a pretext for discrimination. Indeed, aside from the allegation that Bell accused her of flirting with a male sales representative, Miller has not come forward with *any* evidence that Batesville's legitimate reason is a pretext for discrimination.[3] *See Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) ("As a general rule, incidents must be more than episodic; they

---

[3]    Miller suggests that if Batesville had produced all the documents she requested, she would have been able to establish that Batesville's restructuring was aimed at discriminating against female sales representatives. Miller Aff. ¶ 2. However, if Miller believed that Batesville was withholding responsive documents, she should have made the appropriate motions. Moreover, Miller could have availed herself of Fed. R. Civ. P. 56(f) to obtain additional discovery. She failed to do either.

must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness ."). Thus, no genuine issues of material fact exist with respect to whether Batesville discriminated against Miller because of her gender when it reorganized its sales force and revised its compensation structure. Summary judgment is therefore appropriate as to plaintiff's discrimination claims.

Retaliation

In September 2005, Miller filed a Second Amended Complaint, alleging that Batesville had retaliated against her for filing her initial complaint in October 2002. Under Title VII, it is unlawful for employers to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub chapter." *Payne v. MTA New York City Transit Authority*, 349 F. Supp. 2d 619, 629 (E.D.N.Y. 2004) (citing 42 U.S.C. § 2000e-3(a)). The *McDonnell Douglas* three-prong test also applies to such claims but the elements to establish a prima facie case are slightly different. *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546 (E.D.N.Y. 2003). The elements of a retaliation claim are "(1) participation in a protected activity known to the defendant; (2) an employer action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Id.*

Batesville's restructuring and revision of its compensation system for sales representatives and the August 2002 training where Miller alleges that she was asked to retake a test that she failed due to subjective grading, preceded the initial October 2002 complaints. Therefore, those incidents cannot be adverse employment actions in retaliation for Miller's complaint. *See Hunter*, 281 F. Supp. 2d at 547 (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (an inference of retaliation does not arise where "gradual adverse job actions began well before the

plaintiff had ever engaged in any protected activity").

Employment actions that would not be considered adverse under the substantive prohibition against employment discrimination, but nonetheless might deter an employee from filing a discrimination complaint, are adverse employment actions for the purposes of stating a prima facie case of retaliation. *See Burlington N. & Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2415 (2006) (to prevail on a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which ... means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") *(internal quotation marks omitted). See Id.* at 2412-2415. However, the Court also stated that filing a discrimination case "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

Miller alleges that the petty slights such as not being able to use the corporate jet and not being invited to Batesville's golf outings were in retaliation for filing the complaint. The court finds that these do not qualify as adverse actions because, from an objective standpoint, they would not have dissuaded a typical employee from filing an employment discrimination complaint. *See Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 227 (2d Cir. 2006) (denial of emeritus status to a professor not an adverse action for purposes of a First Amendment retaliation claim because it would not chill the speech of "an individual of ordinary firmness").

In August 2004, almost two years after filing the complaint, Miller was placed on the PIP that ultimately lead to her resignation. Being placed on the PIP qualifies as an adverse employment action for purposes of Miller's retaliation claim. However, Miller filed her complaint in October 2002, some twenty-one months before she was placed on the PIP. In order to make out a case of

retaliation based on the timing of the adverse action, the proximity between participation in a protected activity and the adverse action must be "very close." *St. Francis Hosp.*, 281 F. Supp.2d at 547 (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Hence, courts have determined that adverse employment actions taken one and one-half months after the protected activity is sufficient, while more remote adverse actions are not. *Clark Ct. Sch. Dist.*, 532 U.S. at 274 (action taken 20-months later insufficient); *O'Neal*, 237 F.3d at 1253 (quoting *Anderson v. Coors Brewing,* 181 F.3d 1171, 1179 (10th Cir. 1999)) (incident occurring three months later insufficient). *See also Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month period insufficient). The temporal proximity between the PIP and the complaint cannot support Miller's retaliation claim.

Moreover, Miller has made no attempt to demonstrate that employees who did not complain were not subject to the PIP, nor has she alleged that there was any retaliatory animus directed toward her. *See Gordon v. New York City Bd. Of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000); *Byrne v. Telesector Resources Group, Inc.,* 04 CV 0076S, 2007 WL 962929, *6 (W.D.N.Y. Mar 29, 2007)("[a] plaintiff may establish a causal link between protected activity and an allegedly adverse employment action . . .through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed [toward her].").

The change in the tuition policy, which occurred in March 2003, was an adverse action and was in relatively close proximity to the October 2002, complaint. However, as with the PIP, Miller has not shown causation: the policy was changed company-wide, not just for employees who had

engaged in protected behavior. Aside from her conclusory allegations, there is no evidence that the policy change was in response to her complaint. Finally, as noted above, Miller's resignation is not an adverse employment action because she chose to resign rather then attempt to meet the goals of the PIP.

Equal Pay Act

Miller also makes a claim under the Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"). In order to prevail under her EPA claim, Miller must show that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions."[4] *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir.1999). Liability under the EPA is strict; the plaintiff does not need to prove that the employer intended to discriminate. *Id.* Miller presents only the most anecdotal evidence that Batesville pays its employees differently based on sex, namely the fact that Theesfeld and Ferris, both men, were given a larger salary supplement than she was, despite the fact that they all had the same job and that the men were demoted.

Even assuming that such scant evidence suffices to establish a prima facie case under the EPA, Batesville is able to demonstrate that the wage differential is justified by "any other factor other than sex." *Id.* The factor other than sex which caused Batesville to give a larger salary supplement to Theesfeld and Ferris was their experience and their value to the company. Miller's EPA claim is therefore dismissed.

---

[4] To the extent she has any, Miller's claims under New York State equal pay laws are determined in the identical manner to Miller's federal claims. Thus, a dismissal of Miller's federal claims requires a dismissal of Miller's state law claims.

**CONCLUSION**

For the reasons set forth above, defendant's motion for summary judgment is granted. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED:      Brooklyn, New York
            July 23, 2007

_____/s/_____
DORA L. IRIZARRY
United States District Judge